[No. B071013. Second Dist., Div. Seven. Apr. 26, 1994.]

QUEMETCO INC., Plaintiff and Appellant, v.
PACIFIC AUTOMOBILE INSURANCE COMPANY et al., Defendants
and Respondents.

COUNSEL

Cassidy, Warner, Brown, Combs & Thurber and Glen A. Stebens for Plaintiff and Appellant.

Rivkin, Radler & Kremer, J. Douglas Durham, Donald T. McMillan, D. Douglas Shureen, Morris, Polich & Purdy, Michael T. Colliau, Douglas J. Collodel, Richard H. Nakamura, Jr., Mower, Koeller, Nebeker & Carlson and Lynn M. Bouslog for Defendants and Respondents.

OPINION

WOODS (Fred), J.—Plaintiff appeals from a summary judgment entered in favor of defendant insurance companies, ruling that they did not have to provide insurance coverage to plaintiff in two underlying lawsuits. We affirm.

FACTUAL AND PROCEDURAL SYNOPSIS

I. *Factual History*[1]

Except for Continental Insurance Company, which is alleged to be a successor in interest to New Zealand Insurance Company and Phoenix Assurance Company of New York, respondents are insurance companies which issued several general liability insurance policies to Western Lead Products Company (Western Lead), a California corporation, for various periods during which Western Lead shipped sulfuric acid waste and battery electrolytes to the Stringfellow acid pits.

In May 1970, Western Lead changed its name to Quemetco, Inc. (Old Quemetco), a California corporation. In December 1970, pursuant to a written agreement, Old Quemetco sold all of its assets to St. Joe Mineral Corporation (St. Joe), a New York Corporation, and Q Acquisition Corporation (Q Acquisition), a Delaware corporation, a wholly owned subsidiary of St. Joe.

Q Acquisition subsequently changed its name to Quemetco Inc. (New Quemetco), a Delaware corporation. In October 1972, St. Joe sold 100 percent of New Quemetco's shares to RSR, Inc., an unaffiliated Texas corporation.

---

[1]Some facts in this synopsis are based on statements in briefs and are given for background purposes only. (See *DeRose* v. *Carswell* (1987) 196 Cal.App.3d 1011, 1019, fn. 3 [242 Cal.Rptr. 368].)

Old Quemetco, after the sale of its assets to New Quemetco, changed its name to Q & R Liquidating Corporation, a California corporation, distributed all remaining assets to it shareholders and thereafter wound up and was dissolved in January 1971.

## II. *Procedural History*

Appellant New Quemetco filed a declaratory relief action against 12 insurers who insured it, or its predecessor in interest, from 1956 through 1982. The action sought to determine the insurance coverage available to appellant for two underlying lawsuits—*United States* v. *Stringfellow* (No. CV83-2501JMI (MCX)), a federal case then pending in the United States District Court for the Central District of California, and Penny Newman et al. v. Stringfellow (No. 165994MF), a Riverside County Superior Court state case.

Seven of the insurers issued policies naming New Quemetco as the insured. However, the policies issued by respondents were issued to Western Lead/Old Quemetco.

The underlying cases deal with the deposit of hazardous waste material at the Stringfellow acid pits located near Glen Avon in Riverside County. The Stringfellow site received hazardous waste from 1956 through 1972. Stringfellow records showed that Western Lead shipped waste to the site in 1957 and again in 1960 through 1964. No hazardous waste deposits were made by Western Lead after the asset sale to Q Acquisition in December 1970.

The federal case was filed under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) and sought damages for environmental exposure as well as cleanup costs. The state case was an action by 5,000 individual plaintiffs for personal injury and property damages allegedly caused by the hazardous waste material deposited at the Stringfellow site.[2]

On June 4, 1987, the district court granted a motion for partial summary judgment, holding that appellant and 14 other defendants were jointly and severally liable under CERCLA for, among other things, state and federal government response costs, future response costs and damage to natural resources. Appellant's liability under CERCLA is based solely on successor

[2]According to appellant, the state action has been settled with respect to appellant, and there no longer are any issues of defense and indemnity between it and respondents. Respondents do not argue that the type of damages assessed against appellant in the CERCLA action are not covered by their policies or that their policies do not cover the relevant dates.

liability for the acts of its predecessor in interest (Western Lead)—acts occurring between 1956 and 1970.

In this action, Transportation Insurance Company and Continental Casualty Corporation, other defendant insurers, filed a cross-complaint for declaratory relief, subrogation, indemnity and contribution against Western Lead, Old Quemetco and other respondents. Old Quemetco requested respondents to provide a defense to the cross-complaint under the insurance policies issued by respondents.

Respondents filed, or joined in filing, motions for summary judgment on the basis that since the named insured on their policies was Western Lead, not appellant, they had no obligation to defend or indemnify appellant in the underlying lawsuits. There was a set of stipulated facts.

The court granted the motions, and judgment was entered against appellant and in favor of respondents.[1]

Appellant filed a timely notice of appeal.

### DISCUSSION

#### I. *Standard of Review*

The trial court granted summary judgment in favor of respondents who had issued several general liability insurance policies to appellant's predecessor in interest—Western Lead/Old Quemetco. As appellant was not a named insured on those policies, it argued below that those insurance policies had been transferred to it either when Old Quemetco sold all of its assets to New Quemetco or by operation of law.

The court ruled that although there was a triable issue as to whether the insurance policies were transferred by the sale, there was no effective assignment of the policies because the policies had valid consent clauses and respondents had not consented to assignments of their policies to appellant, a transfer of the insurance benefits would result in an increased risk to the insurers, and the policies did not transfer as a matter of law.

We conduct an independent review of the trial court's determinations of these questions of law. (*Stratton* v. *First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071, 1083 [258 Cal.Rptr. 721].)

#### II. *Transfer by Operation of Law*

Citing *Northern Ins. Co. of New York* v. *Allied Mut. Ins.* (9th Cir. 1992) 955 F.2d 1353, appellant contends that the benefits of the policies

issued to Old Quemetco passed to it as a matter of law. In *Northern*, the court concluded that the benefits of an insurance policy, including the right to a defense, issued to a predecessor corporation transferred by operation of law to the successor corporation when it purchased substantially all the predecessor's assets. (*Id.*, at p. 1358.)

*Northern* was based on a products liability action in which parents sought to recover damages for injury to their child allegedly caused by a defective product. There was an asset purchase agreement under which the predecessor agreed to indemnify the successor from any products liability arising from presale activities. The trial court found that the right to indemnity arising from the predecessor's policy transferred together with the potential liability, i.e., the right to indemnity followed the liability rather than the policy itself. (955 F.2d at p. 1357.) In *Northern*, the action was pursued against only the successor corporation.

The *Northern* court looked to the rule of product-line successor liability enunciated in *Ray v. Alad Corp.* (1977) 19 Cal.3d 22 [136 Cal.Rptr. 574, 560 P.2d 3][3] under which a purchaser of substantially all the assets of a firm assumes, with some limitations, the obligations for product liability claims arising from the selling firm's presale actions irrespective of any clauses to the contrary in the asset purchase agreement. (*Northern Ins. Co. of New York v. Allied Mut. Ins.*, *supra*, 955 F.2d 1353, 1358.) Thus, the court held that the insurance benefits passed as a matter of law because the liability passed as a matter of law.

Respondents argue that *Northern* is not applicable as it did not discuss two California cases—*Oliver Machinery Co. v. United States Fid. & Guar. Co.* (1986) 187 Cal.App.3d 1510 [232 Cal.Rptr. 691] and *Peñasquitos, Inc. v. Superior Court* (1991) 53 Cal.3d 1180 [283 Cal.Rptr. 135, 812 P.2d 154]. Neither case addressed the issue of whether the benefits of an insurance policy issued to a predecessor corporation would inure to the successor corporation. However, while these cases are not directly on point, we can glean some guidance from their reasoning.

In *Oliver*, the court, which was faced with the issue of whether the insurance policy of the successor corporation covered injuries caused by a

---

[3]In *Ray v. Alad Corp.*, *supra*, 19 Cal.3d 22, 34, the Supreme Court determined that the plaintiff's claim, based on strict liability, constituted a special exception to the general rule against imposition upon a successor corporation of its predecessor's liability. Other exceptions to the rule against imposing liability are (1) an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts. (*Id.*, at p. 28.)

machine manufactured by the predecessor corporation so as to obligate the insurer to defend an additional insured (the distributor) on the policy, concluded that under the terms of the policy, the machine was not one of the " 'named insured's products,' " and no defense was necessary. (187 Cal.App.3d at pp. 1516, 1519.)

The court referred to the same rule of successor liability cited by the court in *Northern*. In declining to extend the narrow exception for successor liability to insurance coverage for sellers of products which were manufactured by a predecessor corporation, the court reasoned that coverage was a question of contract interpretation and that the duty to defend was based on the subject insurance contract. (187 Cal.App.3d at p. 1517.)

The court noted: "In successor liability cases . . . the person injured is not in a contractual relationship with the manufacturer and generally cannot protect himself or herself from the eventuality of injury from a product manufactured by a predecessor company. Here the distributor Oliver was a party to the insurance contract and could have purchased independent insurance for its liability for products it sold which were manufactured by the predecessor company or could have amended the policy in question to cover liability for those products." (187 Cal.App.3d at pp. 1517-1518.)

Thus, although *Oliver* dealt with a successor's policy as opposed to a predecessor's policy, the court refused to extend the rule for determining liability to the issue of insurance coverage, instead preferring to look to the contract itself to resolve the issue of coverage.

In *Peñasquitos*, the court addressed the issue of whether homeowners might bring a suit for construction defects against corporations that had graded the lots and built the homes, when the corporations had dissolved prior to the homeowner's discovery of the construction defects. The court held that parties are permitted "to bring suit against dissolved corporations for damages that occur or are discovered after dissolution." (*Peñasquitos, Inc. v. Superior Court, supra*, 53 Cal.3d 1180, 1183.)

Noting that bringing suit against a dissolved corporation on a postdissolution claim would often be a pointless exercise because the corporation would have no assets with which to satisfy a judgment against it, the court stated that: "Plaintiffs will be likely to assert postdissolution causes of action only if there is a prospect of recovery from the dissolved corporation's litigation insurer, from undistributed assets, or from assets of the corporation discovered after dissolution." (53 Cal.3d at p. 1191.)

The court concluded that: ". . . if the corporation has liability insurance coverage, its dissolution provides no reason to excuse the insurer from

defending the action and indemnifying those injured by the predissolution activities of its insured, just as a corporation's insolvency or bankruptcy does not release its insurer from payment for damages the corporation has caused." (53 Cal.3d at p. 1192.) Thus, the court imposed on the insurer a duty to defend the predecessor even though it had been dissolved.

Appellant cites a number of cases in which other state courts reached a similar conclusion to *Northern* with respect to the obligations of an insurer when the predecessor's insurance policy was transferred to a surviving corporation in a merger. (E.g., *Brunswick Corp.* v. *St. Paul Fire & Marine Ins. Co.* (E.D.Pa. 1981) 509 F.Supp. 750, 751; *Aetna Life & Cas.* v. *United Pac. Rel. Ins.* (Utah 1978) 580 P.2d 230, 232.)

However, the cases cited by appellant applied state corporation law regarding mergers, and appellant is not a surviving corporation of a merger. The sale of the assets here did not amount to a merger, which is an exception to the general rule against imposing liability on the successor only when one corporation takes all of the other's assets without providing any consideration that could be made available to meet the claims of the other's creditors. (See *Ray* v. *Alad Corp., supra,* 19 Cal.3d 22, 28.)

In this case, appellant was found to be liable for hazardous waste cleanup costs based on an act passed after it purchased Old Quemetco's assets. Thus, unlike the situation in *Northern,* no liability passed as a matter of law at the time of the asset sale as no such liability existed at that time.

The underlying actions here are not product liability actions. Moreover, appellant purchased its own insurance to cover the damages assessed against it in the CERCLA action. Accordingly we conclude that the product-line successor-liability rule should not be applied to transfer the insurance policy from Old Quemetco to New Quemetco as a matter of law.

### III. *Transfer by Sale*

Appellant contends that there was a clear intent to transfer all assets, including the expired insurance policies, in the provisions of the sale agreement. The court found that there was a triable issue of fact as to whether there was such an intent, but even if the policies were assigned, the assignment was not effective because clauses in the policies required the consent of the insurer to such an assignment, respondents had not consented to such assignments, and such assignments would increase the insurers' risk.

Appellant argues that consent was not necessary because its only liability in the underlying suit was based upon a successor in interest liability, which

in turn, was based upon actions taken by respondents' named insured between 1956 and 1970, and since the actions had nothing to do with the successor corporation, the consent clauses should not be given effect.

Appellant cites *Ocean Accident & Guar. Corp.* v. *Southwestern B. Tel. Co.* (8th Cir. 1939) 100 F.2d 441 [122 A.L.R. 133] for the proposition that an agreement of sale may be effective to assign an insurance policy notwithstanding the lack of consent by the insurer. *Ocean Accident* was an action for personal injuries occurring during the predecessor's tenure.

Also citing *Ocean Accident*, the *Northern* court reasoned that the rationale for honoring no-assignment clauses vanished when liability arose from presale action since the risk characteristics of the insured determined whether the insurer would provide coverage and at what cost, and, therefore, the characteristics of the successor were of little importance as the insurer still covered only the risk it evaluated when it wrote the policy. (*Northern Ins. Co. of New York* v. *Allied Mut. Ins.*, *supra*, 955 F.2d 1353, 1358.)

In a similar vein, California courts have stated: "The policy by its own terms, insofar as it involved the substitution of one insured for another, *was not assignable without the consent of the insurer. Any purported assignment of such a policy without consent is ineffective.* [Citations.] On the other hand, it is settled that the right to recover thereon, after loss has occurred, is assignable without company consent. [Citations.] The former situation involves the obligation of the insurance company to indemnify a particular person against loss; the selection of its indemnitee properly is a matter of its own choice. The latter situation involves only the payment of a claim founded upon a loss against which the policy indemnifies, and the designation of a payee of such claims properly is a matter left solely to the discretion of the indemnitee, viz., the insured." (Italics added.) (*Greco* v. *Oregon Mut. Fire Ins. Co.* (1961) 191 Cal.App.2d 674, 682 [12 Cal.Rptr. 802].)

In *Greco*, the court concluded that the proceeds of a fire insurance policy issued to the seller of property destroyed by fire prior to the closing of escrow had been assigned to the buyer. (191 Cal.App.2d at pp. 682-683.) The court reasoned that: "The accrued right to collect the proceeds of the fire insurance policy is a chose in action, and an effective assignment thereof may be expressed orally as well as in writing [citations]; may be the product of inference; and where the parties to a transaction involving such a policy by their conduct indicate an intention to transfer such proceeds, the court will imply an assignment thereof." (*Id.*, at p. 683.)

In this case, at the time of the asset sale, there could have been no assignment of the proceeds of the policies as there was no loss or injury or

accrued right to collect the proceeds in existence. The cleanup damages were not assessed until 1987, long after the 1970 sale.

Moreover, as recognized in *Greco*, the policies, as opposed to the proceeds, were not assignable without respondents' consent. To hold that the policies were assignable without respondents' consent would leave Old Quemetco without any insurance to cover any potential liability assessed against it.

The purpose of consent provisions is " 'to prevent an increase of risk and hazard of loss by a change of ownership without the knowledge of the insurer.' " (*University of Judaism* v. *Transamerica Ins. Co.* (1976) 61 Cal.App.3d 937, 941 [132 Cal.Rptr. 907].) In the instant case, both Old Quemetco and New Quemetco assert coverage under respondents' policies. Thus, unless the consent clauses are enforced, respondents would be faced with the increased risk of having to defend two corporations. Therefore, the consent clauses are valid and enforceable. (1 Witkin, Summary of Cal. Law (3d ed. 1985) Contracts, § 926, p. 827.)

Appellant argues that any potential double defense or indemnity is illusory as only it was held to be jointly and severally liable for the damages in the CERCLA action and the only requested defense from Old Quemetco was in this declaratory relief action. However, Old Quemetco is entitled to a defense and may have a defense to the claim of indemnity. (E.g., in the federal case, the district court ruled that there was a factual question as to whether or not New Quemetco had assumed any liabilities arising in the future as the result of Old Quemetco's actions.)

Thus, we conclude that the policies were not effectively transferred by the asset sale because respondents did not consent to the assignments.

### DISPOSITION

The judgment is affirmed. Respondents to recover costs on appeal.

Lillie, P. J., concurred.

**JOHNSON, J.**—I respectfully dissent.

I disagree with the majority opinion's criticism of *Northern Ins. Co. of New York* v. *Allied Mut. Ins.* (9th Cir. 1992) 955 F.2d 1353 and the resulting conclusion old Quemetco's liability insurance did not transfer to new Quemetco by operation of law.

I deem *Northern Ins.* persuasive precedent on the question before this court. The majority appears to concede that if correctly decided *Northern Ins.* indeed supports the transfer of liability coverage from old Quemetco to new Quemetco. The majority, however, deems *Northern Ins.* to be wrongly decided because it failed to consider two "critical" California decisions the majority argues reach a contrary position. I disagree, finding neither of these cases require a rejection of *Northern Ins.* or its application to the instant case.

I happened to have authored one of the two California opinions the majority feels the Ninth Circuit improperly ignored in *Northern Ins.—Oliver Machinery Co.* v. *United States Fid. & Guar. Co* (1986) 187 Cal.App.3d 1510 [232 Cal. Rptr 691]. In my view, *Oliver* has no relevance to the issues before us in this case nor to the principles enunciated in *Northern Ins.* Nor do I find the other case, *Peñasquitos, Inc.* v. *Superior Court* (1991) 53 Cal.3d 1180 [283 Cal.Rptr. 135, 812 P.2d 154], contradicts *Northern Ins.* in any significant way.

*Oliver* involves an issue so far removed from the question resolved in *Northern Ins.* I would have found it remarkable if the Ninth Circuit had bothered to mention it, even in a footnote, in its opinion. In *Oliver*, this court was concerned with the issue of the *successor* corporation's insurance policy and whether it covered an "additional insured" on that contract, a distributor, for injuries caused by the *predecessor* corporation's products when the contract specifically limited coverage to the successor corporation's products. This is entirely unrelated to the question of whether the benefits of the predecessor company's insurance policy passed to the successor by operation of law as to injuries which occurred before the successor bought out the predecessor. The former issue, of course, is a matter of construction of the contract the "additional insured" signed with the insurance company.[1] But that has nothing to do with the issue of whether and which benefits pass to the successor corporation from the predecessor corporation related to injuries the predecessor corporation's actions already have caused.

The rationale for holding the benefits of indemnification and of defense pass by operation of law is thoroughly explained in the *Northern Ins.* opinion

---

[1] Of further note, in the *Oliver* opinion this court did not even decide the question whether the *successor* corporation's insurance company has a duty to indemnify and defend that company for injuries the *predecessor* corporation causes, either by operation of law or by contract or otherwise. "We do not, and need not, reach the question whether [the successor corporation's insurer] has a duty to defend and indemnify [the successor corporation] for injuries caused by products manufactured by [the predecessor corporation]." (*Oliver Machinery Co.* v. *United States Fid. & Guar. Co, supra*, 187 Cal.App.3d at p. 1519.) The *Oliver* opinion dealt solely with the coverage the policy was deemed to extend to a third party, the "additional insured" who was a distributor and neither the predecessor nor the successor corporation. Consequently, the issue actually decided in *Oliver* was yet another step removed from that before the *Northern Ins.* court.

and will be discussed below. In no sense is that rationale inconsistent with the holding and rationale of *Oliver*. Far from ignoring some controlling—or even relevant—California authority, the *Northern Ins.* court quite properly paid no heed to an opinion which had no bearing on the issues before it. In my view, if the Ninth Circuit had bothered to mention the *Oliver* opinion I drafted the only appropriate mention would have been to distinguish it as irrelevant to the *Northern Ins.* case.

*Peñasquitos, Inc.* v. *Superior Court, supra*, 53 Cal.3d 1180 appears even less relevant to the issues the *Northern Ins.* court decided. At the most, *Peñsquitos* held a dissolved *predecessor* corporation's insurer *may* remain responsible to defend and indemnify the *predecessor* corporation for any liability it incurs as a result of claims filed after dissolution activities. (53 Cal.3d at p. 1194.)[2] That possibility has no bearing on whether the *predecessor* corporation's coverage passes to and protects the *successor* corporation as to that corporation's liability for injuries arising out of the *predecessor* corporation's activities. Assuming the predecessor's insurance company is required to indemnify the predecessor as well as the successor, the total loss it is required to pay will be the same. However the total burden of that liability ultimately may be apportioned between the predecessor and successor corporations, at the worst the predecessor's insurer will only be responsible for that total obligation, that is, the same sum for which it would have been held liable had the successor never sold out to the successor corporation. So contrary to the majority (maj. opn., *ante*, at pp. 502-503) there is no inequity in requiring the predecessor corporation's insurer to cover the successor corporation for harm the predecessor caused while in control of the operation. Accordingly, *Peñasquitos* in no way can be read to affect the issues determined in *Northern Ins.*[3]

Which brings us to *Northern Ins. Co.* of *New York* v. *Allied Mut. Ins., supra*, 955 F.2d 1353, a recent decision decided under California law that

---

[2] The Supreme Court hinted, however, in *Peñasquitos* that a claim based on a statute enacted after dissolution might not be covered by the dissolved corporation's insurer. (53 Cal. 3d at p. 1193 [distinguishing *Levin Metals Corp.* v. *Parr-Richmond Terminal Co.* (9th Cir. 1987) 817 F.2d 1448, which had held a dissolved corporation could not be sued under CERCLA because it had dissolved some nine years before CERCLA's enactment].)

[3] As will be discussed in more detail below (see pp. 506-507, *post*), there is a further reason *Peñsaquitos* has no relevance given the *Northern Ins.* rationale. In the latter case, the predecessor corporation actually contracted in the sale agreement to indemnify the successor corporation for its "successor liability." The *Northern Ins.* court found this had no effect on its rationale, that "insurance benefits follow liability" by operation of law. The fact *Peñsaquitos* may impose some ultimate liability on defunct predecessor corporations provides no more reason to deviate from the principle *Northern Ins.* explains than does the predecessor's ultimate contractual liability which the Ninth Circuit found irrelevant in its *Northern Ins.* opinion.

resolves nearly all the issues in this case and does so contrary to the majority opinion. In that case Brown-Forman bought out California Cooler under an agreement California Cooler would reimburse Brown-Forman for any liability claims arising from presale activities. A child born before the sale filed suit against Brown-Forman after the sale alleging fetal alcohol syndrome attributable to California Coolers his mother consumed during her pregnancy. This underlying lawsuit ended in a voluntary dismissal so only the costs of defense were at issue. The predecessor's insurance company was sued for contribution to those costs.

In its opinion, the Ninth Circuit first conceded the predecessor's insurance policy was not among the assets assigned and transferred under the sales agreement between the predecessor and successor corporations. This was because the agreement expressly excluded "any contracts that require consent to assign. By its terms, Allied's policy required California Cooler to obtain its consent before assigning the policy." (955 F.2d at p. 1357.) The court pointed out the policy benefits as opposed to the policy itself could have been transferred without the predecessor insurance company's consent. Nonetheless, it concluded those benefits were not transferred because ". . . we find little evidence of any intent to transfer these policy benefits." (*Ibid.*) (Presumably this was because the agreement provided the predecessor corporation itself would be responsible to indemnify the successor for any liability claims attributable to presale activities.)

But the Ninth Circuit then concluded that neither the sales agreement between the predecessor and successor corporations, nor the intent of these parties, nor the terms of the predecessor corporation's contract with its insurance company ultimately controlled. Instead the benefits of the policy transferred by operation of law. Since the doctrine of "successor liability" transferred the liability from the predecessor to the successor corporation, the right to indemnity followed as well. "[T]he right to indemnity arising from [the predecessor corporation's insurance policy] transferred together with the potential liability. This right to indemnity followed the liability rather than the policy itself. As a result, even though the parties did not assign [the predecessor corporation's] policy in the agreement, the right to indemnity under the policy transferred to [the successor corporation] by operation of law." (955 F.2d at p. 1357.) (It should be noted this transfer took place even though the predecessor corporation remained responsible under the sale agreement for indemnifying the successor corporation for those same losses and thus the predecessor corporation's insurer presumably could end up paying litigation costs for both parties.)

Having established this principle, the Ninth Circuit shifted to the further question whether it extended to the cost of defense as well as the indemnification of loss, especially in the face of "no assignment" and "cooperation"

clauses in the insurance contract. The court had no difficulty with this issue either. "[T]he rationale for honoring 'no assignment' clauses vanishes when liability arises from presale activity. . . . [¶] . . . [¶] . . . Admittedly, defense costs could balloon if the successor firm failed to cooperate in the defense. Inasmuch as the successor firm was not a party to the original policy, the risk of noncooperation arguably increases. Yet, the insurer is protected against this risk because it is freed of its defense obligation if the successor firm does not fulfill its duty to aid in the defense." (955 F.2d at p. 1358.)

While it is true *Northern Ins.* involved "successor liability" in the context of a product liability case, there is no reason its rationale would fail to apply where "successor liability" was imposed in a different sort of case. Here the court already determined "successor liability" applies to this action under CERCLA, even though the harmful acts took place years before Congress enacted CERCLA. The principle that "insurance benefits follow liability" makes equal sense in CERCLA cases as it does in product liability cases. If the law holds the successor liable for its predecessor's tortious acts—no matter the nature of those acts—then the law likewise transfers the insurance benefits covering liability for those acts to the successor. And as *Northern Ins.* emphasizes, it does so irrespective of whether the predecessor remains ultimately liable for the financial burdens its tortuous acts impose on the successor. And, again as *Northern Ins.* emphasizes, the law transfers the insurance benefits along with liability even if the predecessor's contract with its insurer expressly disclaims such responsibility without its consent.

The majority attempts to make something of the fact the particular causes of action involved in the underlying lawsuit here were predicated on CER-CLA, a statute which did not come into existence until several years after the predecessor last dumped toxic chemicals into Stringfellow and several years after the predecessor corporation sold out to the successor corporation. This conceivably *might* be a relevant consideration were the sale contract and the insurance contract the determinative factors. In that instance, whether the "causes of action" already were in existence and what the parties and the insurance company intended and could have anticipated, all of these issues might have had some bearing on whether the insurance benefits for the CERCLA causes of action transferred to the successor corporation. But here the insurance benefits transferred to the successor by operation of law along with the liability for the presale acts of the predecessor.

What is relevant is whether the predecessor's acts occurred before the sale, not whether they matured into cognizable causes of action before that

time. The law of torts (and strict liability) is constantly changing, either through statutory change (as it did here) or through judicial opinions. Because of a new statute or a new appellate decision, an act which gives rise to a cause of action today may not give rise to a cause of action next year. Conversely, because of another statute or appellate decision, an act which does not give rise to a cause of action today may become the basis of a cause of action next year—or next decade. If so, the person or entity who committed the act may be held liable in tort or strict liability for that past conduct and the insurance company, in turn, is responsible to defend and indemnify the tortfeasor for that conduct.

The predecessor corporation's toxic dumping into Stringfellow occurred at a time when the only possible basis of liability was some sort of common law action for nuisance or negligence. Years later, however, along came one of those frequent changes in the law, in this instance a statutory change, making those same acts of dumping subject to an added cause of action in strict liability. While this may have been a more dramatic change then most, it was far from unique in the history of the law. This sort of sudden expansion in an insured's susceptibility to lawsuit is one of the risks against which insurers insure.

Had the predecessor corporation not sold out can there be any doubt its insurer would have had a duty to defend and indemnify that corporation in the strict liability lawsuits filed under CERCLA, even though those suits were based on a statute enacted years after the corporation's toxic dumping? Since there was a sale, however, the successor corporation was found liable under CERCLA for that toxic dumping, on a "successor liability" theory.[4] Further, because the predecessor corporation's insurer would have been responsible for its insured's acts of toxic dumping even though its liability would have been based on CERCLA, a law passed years after the dumping, it likewise is responsible for defending and indemnifying the successor corporation for its liability under CERCLA. As *Northern Ins.* emphasized, insurance benefits follow liability. And, I submit, that principle extends to liability which is expanded by legal changes occurring after the transfer takes place.

I conclude the Ninth Circuit decided *Northern Ins.* correctly and its rationale is consistent with California law. In particular I agree with its

---

[4]"Successor liability may be imposed on corporations that have merged with, consolidated, *or otherwise continued the business* of a corporation that is a responsible party under CERCLA. . . . Substantial continuity is primarily a question of fact. Among the factors that should be considered in making the determination are whether the business of both the corporations is essentially the same, . . . and whether the new entity has the same production processes, produces the same products, and essentially has the same body of customers." (Lathrop, Insurance Coverage for Environmental Claims (1992) § 2.06[4][a][ii], fns. omitted.)

conclusion insurance benefits follow liability in "successor liability" situations *by operation of law*. For reasons explained above, I further conclude this principle applies to all "successor liability" situations not just "product liability" cases and extends to causes of action based on legal changes occurring after the successor buys out the predecessor. All of this leads me to conclude the trial court erred in granting summary judgment against the successor corporation and in favor of the predecessor corporation's insurance companies.[5]

A petition for a rehearing was denied May 24, 1994, and appellant's petition for review by the Supreme Court was denied July 14, 1994. Mosk, J., was of the opinion that the petition should be granted.

---

[5]Since I am so thoroughly convinced the insurance benefits transferred by operation of law, I find it unnecessary to discuss the alternative grounds these benefits transferred under the terms of the sale. (See maj. opn., *ante*, at pp. 501-503 for discussion of this grounds for fixing responsibility on the predecessor corporation's insurance companies.) While I have some disagreement with the majority's discussion of this series of issues, I see no reason to prolong this dissent. As emphasized earlier (see *ante*, at p. 506) these issues of consent, intent, etc., are irrelevant and unnecessary to a proper resolution of this appeal.